Minzesheimer *v.* Doolittle.

CHARLES MINZESHEIMER et al.

*v.*

ELMER G. DOOLITTLE et ux.

[Filed January 31st, 1898.]

1. Where, in a suit to set aside a conveyance to a wife as fraudulent, she admits in her answer that complainants' judgment was rendered upon a note given for a debt due from the husband, the question as to whether the debt · arose upon an illegal gambling transaction cannot be considered.

2. Actual intent to defraud upon all the circumstances of the case must be proved before a voluntary conveyance will be decreed void at the suit of a subsequent creditor; and a voluntary conveyance with a view of engaging in or continuing hazardous enterprises, and with the view of escaping responsibilities for losses which may be reasonably contemplated in such enterprises, while it is no longer held to be evidence from which the legal inference of actual fraud must be conclusively drawn, is evidence of such actual fraudulent intent and may either along or in connection with the other circumstances of the case and according to the circumstances of each case, be sufficient to make out the actual intent to defraud.

3. Upon the facts of this case—*Held,* that a case of actual intent to defraud subsequent creditors, in which both the defendants participated, has been satisfactorily made out.

On bill, &c.   Heard on bill, answer, replication and proofs.

*Mr. Mahlon Pitney,* and *Mr. James G. Chandler* (of the New York bar), for the complainants.

*Mr. Frank Bergen,* for the defendants.

EMERY, V. C.

This is a bill by a judgment and execution creditor to set aside an alleged fraudulent conveyance of lands, made by the judgment debtor to his wife, through an intermediary. The debt upon which the complainants' judgment was founded was created subsequent to the deed, and the claim to set the deed aside is based on charges of actual intent to defraud subsequent creditors. This fraud, as substantially charged in the bill, is based upon the following facts: Doolittle, the judgment debtor, was at the date of the deed, November 15th, 1887, a member of a New York dry goods commission-house—Porter Brothers & Company—the current term of which partnership expired December 31st, 1887. He had been a member of the firm for eighteen years, but in November, 1887, determined to retire. He had speculated heavily during the summer and fall of 1887, losing in one series of transactions over $15,000, and in November, 1887, his speculative purchases and sales then outstanding amounted to over $350,000, and were extremely hazardous; his resources were moderate, not exceeding $20,000, and the nature and extent of his speculations were such that a moderate adverse fluctuation in the market would imperil all his resources. With a view of recouping his previous losses, he determined to continue the pending speculations and to further extend them, and made the conveyances in question with the intention of placing the tract of land conveyed beyond the reach of any of the creditors to whom he was then indebted, or to whom he would become indebted in the course of his contemplated speculations.

Elmer G. Doolittle, the defendant debtor, conveyed the premises in question to his wife by a deed dated November 15th, 1887, made to his brother, Dana E. Doolittle, who immediately

conveyed them to the defendant Ellen J. Doolittle, the wife of the debtor. The consideration named in each of the deeds is $1, and it is charged that they were without any consideration whatever. The deeds were actually acknowledged on November 21st, 1887, and recorded on the following day. It is further charged that after the execution and recording of the deeds Doolittle enlarged his speculations, so that during the winter of 1887 and 1888 he about doubled the extent of his transactions, and, in the month of March, 1888, when he failed, was carrying upon margins not less than fifteen thousand bales of cotton, costing in the aggregate $750,000, while his resources, excluding the land in question, did not amount to $10,000, and that finally in March, 1888, his entire transactions were closed out at a loss to him of over $30,000, which is still unpaid, the complainants' own claim for such losses being about $3,300. The defence made by the joint answer of the judgment debtor and his wife to this attack upon the conveyances is that the deeds were made upon a full consideration paid to the debtor by his wife, and that at the time of the conveyances the husband was neither indebted nor insolvent, but was in affluent circumstances.

The answer denies, specifically (following its language), the allegations of the bill as to the speculative dealings of Doolittle in the summer of 1887 and at the time of the deed or afterwards, and especially that, at the time of the making of the deed, Doolittle was carrying purchases of cotton on margin to the extent alleged in the bill. As to the consideration of the conveyances, the answer alleges that they were made in good faith and in payment of a loan of $5,000 secured by a promissory note made in the year 1878 by the husband to his wife, upon which interest was due from its date to the execution of the conveyance. As to the value of this land conveyed to the wife, the bill alleges that it was conveyed to Doolittle in 1875 for $13,494, and that in November, 1887, it was worth more than $12,000, being subject to a mortgage of $4,000. The answer, on the other hand, alleges that $8,000 was the price originally paid in 1875, instead of $13,494, and that $8,000 was its full value unencumbered. The only evidence relating

to the value of the land in 1887 is that of a single witness pro-
duced by defendants—a real estate dealer in Montclair, where
the property is situate—who values it at $25 to $30 per front
foot, making the total valuation of the four hundred and eight
feet from $10,200 to $12,240 in November, 1887.   If the note
of $5,000 with interest from January 1st, 1878, to November,
1887, was in fact due, or can be treated as then due, to the wife
from her husband, and the deed was made in payment therefor,
the land was not worth more than the debt, and there can be
no ground, in my judgment, for treating the payment as a fraud
on creditors.  . The principal disputed question of fact in the
case, therefore, is whether this debt really existed at the time of
the conveyance and whether the payment of the debt was the
object of the conveyance.

At the argument a preliminary question or defence was raised
by defendants' counsel, challenging the right of the complain-
ants to any relief in a court, upon the ground that the debt
which was the foundation of the judgment arose upon an illegal
gambling transaction.   Whether this question can be now con-
sidered depends to some extent upon its being a question at
issue, and upon this point the *status* of the record in the case is
as follows :

The judgment against the husband, on which this bill is
founded, was obtained in the supreme court of this state on
August 20th, 1888, and this judgment was based on a judgment
obtained in the supreme court of the city and county of New
York on June 15th, 1888, this latter judgment being founded
on a note for $3,295.21 given by Elmer G. Doolittle to the
complainants, dated March 27th, 1888.   As to the consideration
of this note the bill states

" that on or about March 27th, 1888, and for a considerable time prior thereto,
Elmer G. Doolittle  *  *  *  was indebted to complainants in large sums of
money, which amounted on that day to that sum, and in consideration thereof
the note was given."

As to these allegations the joint answer of both defendants
expressly admits

"that on or about March 27th, 1888, the defendant Elmer G. Doolittle became indebted to the complainants in the sum of $3,295.21 and gave his promissory note therefor."

The answer then further admits the suit in New York on the note and the recovery of judgment thereon and the recovery of judgment in this state.   These admissions of the answer manifestly prevent any adjudication now upon the original legality or illegality of this debt as an adjudication upon an issue raised on the record, upon which the parties were entitled and obliged to produce proofs before adjudication.   Nor, under the decisions of this court, is it clear that the wife could in this suit have attacked, by her answer, the validity of the judgment against the husband on the ground now alleged.   Vice-Chancellor Pitney, in *McCanless* v. *Smith, 6 Dick. Ch. Rep. 505 (1893)*, after a full examination of the cases, reached the conclusion that a third party alleged to hold lands of a judgment debtor, in fraud of the judgment creditor, could not, in the suit to reach the property founded on the judgment, question the judgment on account of an illegal consideration upon which it was alleged to be founded.   The cases referred to by defendants' counsel in which relief was denied on the ground of the illegality of the consideration, appear on examination to be cases where the question of illegality was directly raised and at issue upon the record, and an adjudication in favor of or against the complainant's claim necessarily passed upon the question of legality of the original transaction or bar of relief.   Such cases are *Flagg* v. *Baldwin, 11 Stew. Eq. 219*, between mortgagor and mortgagee; *Watson* v. *Murray, 8 C. E. Gr. 257; Den* v. *Shotwell, 4 Zab. 789*.

Another line of cases was cited by counsel in support of the contention that the question of illegality will be considered by a court of equity, although not in issue on the record, but these cases are either instances where equitable relief was asked in aid of a strict legal right obtained by complainant, which legal right was, on the face of it, so unconscionable and inequitable that a court of equity declined to aid him (*Randolph* v. *Quidnick Co., 135 U. S. 457; M. & M. Railroad Co.* v. *Cromwell, 91 U. S.*

·643; Rich v. Sydenham, 1 Ch. Cas. 202), or they are cases where the complainant has been himself guilty of inequitable ·conduct, relating directly to or connected with the equitable relief asked, and this inequitable conduct debarred him from obtaining equitable relief. De Grauw v. Mechan, 3 Dick. Ch. Rep. 219; Johns v. Norris, 7 C. E. Gr. 102.

In the present case complainants have recovered a judgment .against the debtor, which is final and conclusive against him, and they now appeal to the ordinary equitable jurisdiction to reach property in a third party's hands, alleged to have been ·conveyed fraudulently to such third party and to be applicable to the discharge of the judgment. Such third party charged with fraud, on this application to a court of equity, admits the debt by answer on the record. The legality of the original debt was not an issue on the record; neither are there now proofs before the court upon which it could safely or properly find that the original transactions were in fact illegal in the .State of New York, where they took place. Under such conditions there is nothing inequitable ar unconscionable in the complainants applying for equitable relief in aid of the judgment, as any judgment creditor might do. This preliminary objection is therefore overruled and the case is to be considered on its merits.

As to the consideration and objects of the deeds in question, ·the main facts as sworn to, positively and unequivocally, by both Mr. and Mrs. Doolittle, are that on January 1st, 1878, Mr. Doolittle was indebted to his wife in the sum of $5,000 for the par value of $5,000 on government bonds belonging to her, and which she then gave to him, receiving in consideration therefor a note of her husband for $5,000, dated January 1st, 1878, payable on demand with interest. They both further swear that no interest was ever paid on this note, and that on November 15th, 1887, the conveyances were made in payment for the amount due for principal and interest on the note. (This amount would be about $8,000.) At this time of payment the note was produced by Mrs. Doolittle, as they both swear, and the interest due on it was calculated separately by each, and the note was

handed to her husband, who tore off his signature and returned the note to his wife. The note was produced at the hearing by the wife, who swears that it had been continually in her possession from the time of its execution. Notwithstanding this positive evidence of both Mr. and Mrs. Doolittle as to the original consideration of the note and its subsequent payment by the conveyances in question, the complainants' counsel contend that upon the whole evidence of the case they are entitled to claim, first, that the alleged indebtedness for the government bonds in January, 1878, never existed; and secondly, that if it did exist originally, it had no existence at the time of the conveyance, but had been previously satisfied and was revived at that time for the purpose of making a fictitious consideration for a deed which was really intended to defraud creditors. The evidence claimed to bear upon these points is voluminous, but the principal facts to which it is directed may be stated somewhat briefly. Complainants' main contention in relation to the first point—the existence of the indebtedness—is that Mrs. Doolittle did not have these $5,000 in bonds or money to advance, in 1878, to her husband. Whether Mrs. Doolittle did have such a considerable sum in hand at that time involves a consideration of evidence relating to her property and financial transactions with her husband from the time of their marriage in January, 1866, for both Mr. and Mrs. Doolittle now swear that there was a previous similar loan of $5,000 by her to him on January 1st, 1873, which previous loan was still wholly unpaid, both as to principal and interest, at the time of the loan in 1878, and inasmuch as they both also now state that, between 1866 and 1878, Mrs. Doolittle paid in addition from her own money a considerable sum toward the furnishing of their house, the question is fairly raised whether Mrs. Doolittle has satisfactorily shown that she possessed this fortune of at least $11,000 in January, 1878. Her own account is that, at their marriage on January 1st, 1866, her husband gave her $3,000 in bonds, and her uncles gave her $5,000 in bonds; that her father owed her $1,000, which was paid from his estate, and that she received in addition from her father's estate, during the years 1866 and 1867, sums amount-

Minzesheimer v. Doolittle.

ing to about $2,000. Her final statement, after full opportunity for reflection, is that her entire fortune at or shortly after her marriage was about $11,500, of which $10,000 was in bonds and the balance was in money. This statement as to her original fortune is corroborated on this hearing by her husband, who also says that he gave his wife $3,000 in bonds at the time of their marriage; that he knew exactly what the size of his wife's fortune was, and that it was about $11,000 (one or two hundred dollars less), and that it was principally invested in government bonds. He also now says that he saw these bonds from time to time, and that within eighteen months or two years after the marriage he knew that her fortune was about $11,000. The credibility of the husband's testimony as to the amount of the wife's fortune, and whether it was sufficient to make the second loan of $5,000, which is the vital point of the present inquiry, is impaired, however, by his previous statements on this point, given under oath on supplementary proceedings taken in New York, upon the judgment there obtained.

On this examination taken in September, 1892, he stated that his wife's money went into a house which they built in Montclair, New Jersey, about 1872; and to the question where his wife got her money, he states that she got $2,000 from her father's estate and $3,000 from her uncles, one giving $2,000 and another $1,000. In this examination no mention was made of $3,000 bonds as given by him, and the gift of the uncles was $3,000 and not $5,000. At a subsequent examination in December, 1892, in reference to this point of the wife's fortune at the time of the marriage, his statement is, "I bought $3,000 in bonds, which made her $8,000 when I was married. I gave her $3,000 in bonds when we were married." His first statement in the present suit, in answer to the direct question as to the property his wife had at the time of the marriage, is, "She had about eight or ten thousand dollars in coupon bonds on the day she was married," and that he saw the bonds, $3,000 of which came from him, and the others he understood she got from her uncles. This evidence of the husband, as it seems to me, cannot be fairly considered as corroborating the wife's statement as to

the ownership of more than $8,000 in bonds—$3,000 as gifts of her uncles, $3,000 from himself and $2,000 from her father's estate. If, as he now says, he saw the bonds and knew exactly what the size of his wife's fortune was, it is impossible to reconcile his present statement that there were $10,000 in bonds, with his equally precise statement under oath in December, 1892, that there were $8,000, and so far as the husband's corroboration on this special point is concerned, it is not satisfactory.

As to the corroboration of the wife from other sources, the uncles who are said to have given the money all died as long ago as 1881. And inasmuch as there is nothing in the account which has been given of these gifts from the uncles to indicate that any person other than the uncles themselves and Mr. and Mrs. Doolittle had knowledge of the transaction, Mrs. Doolittle's evidence, unless her credibility is shaken, must and may be fairly relied on as to the amount of these gifts. One circumstance which bears somewhat against her evidence is that at this time she kept a diary, and that although this diary of 1866 and that of 1867 contain memoranda of the receipt at different times of the money from her father's estate (amounting to about $2,000), it contains no memoranda of the gifts either of her husband or uncles. This omission, however, is not, in my judgment, sufficient to discredit her statement, for if relied on as sufficient for that purpose the inference would be that no sum whatever beyond the $2,000 was received from these or any other sources. Such conclusion appears to me to be inconsistent with other proofs in the cause, relating to the expenditures of money about the time of building and furnishing the house in Montclair, from 1871 to 1873, when the husband's means were evidently supplemented, to the extent of some thousands of dollars, by money not derived from his own sources.

The husband, at the time of his marriage, was in the employ of the firm Porter Brothers & Company, dry goods commission-house, upon a salary, and had, as he says, at the time of the marriage, several thousand dollars. In January, 1868, he became a partner, with a share of two and one-half per cent. of the profits, besides $1,000 allowed for expenses. In 1869 he

bought property in Montclair, upon which, in 1872, he built a homestead, and in 1873 or 1874 a stable was erected, the entire cost of the property and improvements being about $14,900, part of the funds being supplied by a mortgage of $8,000 placed on the property. The furnishing of the house cost, according to the wife's statement, two or three thousand dollars, thus making in all an expenditure, between 1869 and 1874, of about nine or ten thousand dollars beyond the amount received on the loan. Doolittle, during the whole of this interval and indeed up to January, 1887, kept no bank account, and his payments, so far as payments were made by check, were made through the firm's checks, which were charged to his account. The $8,000 received on the mortgage loan went through these accounts, being credited to him in February, 1872, and a large number of the payments for the building of the house and stable were paid by the firm's checks. Now, Doolittle says that, from 1871 to 1874, with his expenses for building, &c., and living expenses, he was running behind with the firm. On January 1st, 1873, according to the account of both himself and his wife, he got from her the first loan of $5,000, for which he gave her his note payable on demand with interest, receiving from her government bonds, $5,000 par value, which he sold, giving to her in cash the premium obtained on the sale. This sum of $5,000 does not, nor does any part of it, appear to have passed immediately through the firm accounts, and Doolittle now says that he does not know whether it did or not, and that it was used by him for living expenses and for the building. I find, however, on examining the accounts, that on January 31st, 1873, Mr. Doolittle did receive a cash credit on the accounts for $2,487.81, being the only large credit of cash, except the $8,000, of February 9th, 1872, which appears on the accounts. There is no evidence as to the source of this credit other than the credit itself, but, taking the accounts as they stood, it is corroboration, to some extent, of Doolittle's receipt of money to that considerable extent from outside sources. The state of his accounts from 1871 to 1874, inclusive, also shows that, during this time, he was expending yearly about $2,500 in excess of the money

he was earning with the firm, and that the balance to his credit on January 1st, 1871, of over $4,500, had been changed to a balance against him of over $2,400 at the end of 1874. His average income from his business during this period was nearly $6,300; his expenditures (which included building expenses to some extent) nearly $8,800. He kept several horses, and taking into consideration that he built the house and stable and furnished the house at a cost of about nine or ten thousand dollars, besides paying his living expenses and interest, and drew from the firm only $6,000 over his income for these years, I think it may be considered as satisfactorily made out that, during this time, the husband did receive, from some source other than his business, a considerable sum of money, and that this condition of things corroborates the evidence of both husband and wife as to a fortune beyond the $2,000, and that she did make this loan of $5,000 to him in January, 1873, or during the time when the house was being built and furnished.

A question not so satisfactorily answered by the evidence is whether she made another loan of $5,000 in January, 1878, and had the money for this purpose. The wife swears that she did and that another lot of government bonds, $5,000 par value, was given to the husband for a like note of the husband for $5,000, payable on demand, which bonds the husband also sold, giving the wife the premium. The husband's account of this transaction is similar. In reference to the possession· of this large amount at that time, Doolittle has no corroboration by the books of the firm during that year, which show no credits to his account other than the usual credits for profits, salary and interest on balances. Nor during that year or the previous year were his drafts upon the firm account equal to the amount of his usual credits, so that at the beginning of 1878 his credit balance had increased to over $5,000. There was no apparent necessity, therefore, for the use by him of this large sum of money, and his account of its disposition is indefinite and unsatisfactory. To the inquiry as to what he did with it, he says:

"I used it in my own business; I don't know exactly; I had outside business; I was speculating, and I dealt in horses; I always had money in use

outside; sometimes the money I had in use outside might have been kept in the safe of the firm, where I kept loose money I got from outside parties while I was a partner—just any account I happened to have, up to $5,000 sometimes; I think I have had as much as $5,000 there at a time."

Afterwards, on the question being repeated as to what he did with this money received from the sale of the bonds in 1878, he says, " I lived on it," and he again repeats this, saying that he paid household expenses and anything that came along.   It is difficult to believe this latter statement as to the disposition of the money, for, from 1877 on to 1887, his income from the firm materially increased, and, while his drafts on it also increased, they did not, until the year 1882, equal the amount of his profits, and his credit balance on the books was, from 1877 to 1882, increased to $25,000.   If the question as to the receipt of the $5,000 from his wife depended on the husband's ability or willingness to give now a satisfactory account of his disposition of the money, the loan could not, I think, be considered to have been satisfactorily shown.   But the main evidence upon which the making of the loan depends, is the evidence of the wife with such corroborative force as may be given to the evidence of the husband.   That the husband now cannot or will not give a satisfactory account of what he did with it, may affect the corroborative force of his evidence as to the loan, but is not of itself sufficient to discredit her account, about which there is nothing which is on the face of it incredible or improbable.   The production of the original notes given for the two loans is further relied on as corroborative evidence of the statements made by Mr. and Mrs. Doolittle, and where no fair suspicion is shown in relation to such securities, they are ordinarily, as collateral contemporaneous documents, entitled to weight as indicating a bona fide transaction.   In this case the wife and husband both say that the notes were given to the wife, and she says that they both remained in her sole custody until December, 1881, when the note of 1873 was given by her to her husband, who tore off the signature and returned it to her when he made to her a deed for the homestead.   The same thing occurred in November, 1887, with reference to the note of 1878, on making the deed

now in question, and the latter note was also returned to the wife with the signature torn off, and she says they have both remained in her custody until produced at the trial.  Upon the back of each note, when now produced, is a calculation of the interest due on each, made in lead pencil and by Mr. Doolittle. His statement and that of his wife is that these calculations of interest were made at the time of the production of the notes. This evidence of both parties concerned as to the original making, mutilation and endorsement of the notes and their continuous custody manifestly excludes any theory of the manufacture of the note for the purpose of evidence subsequent to the alleged loans, except upon the theory of deliberate perjury upon the part of both Mr. and Mrs. Doolittle.

The complainant, however, insists that both the notes are instruments of later manufacture than 1882, and that neither of them was made at their apparent date.  The first ground relied on is that there is in evidence a continuous series of papers showing the signatures of Elmer G. Doolittle from 1871 to 1887, and his method of making the capital letter of his name, "Elmer," which was also the capital letter of his wife's name, "Ellen." These papers comprise mainly the checks endorsed or signed by Doolittle during these years, amounting in number to over one hundred and sixty, together with the notes and deeds in question and a few other papers showing his signature.  It is claimed that, from the earliest signature produced down to about 1887, Doolittle invariably wrote the letter " E " of his name by commencing it at the right-hand side of the upper curve, and that it was not until long after these notes of 1873 and 1878 purport to have been made, that he made this letter by commencing with a loop from the left-hand side of the upper curve, but that when he once commenced making his signature in this fashion he invariably continued it, and that this was his method of writing the letter in 1887.  Both of the notes in question were written by Doolittle, each of them contains the name of his wife, Ellen J. Doolittle, written out at length by him, and on each of the notes the upper portion of the letter " E," commencing his signature, still remains.  In each of these four cases

the capital letter is made with a loop commencing on the left-hand side of the upper curve.   Upon the examination of all the signatures which have been produced, I find that on sixteen checks endorsed by him, running from January 9th, 1871, to January 1st, 1873, all of them are written in the manner first described, and on none of them is the letter " E " commenced with a loop.

On the next forty checks, running from January 9th, 1873, to March 11th, 1878, also endorsed by Doolittle, the letter " E " is not once written with a loop, and in several instances where these checks are specially endorsed by Doolittle, payable to " Edward Sweet," the holder of the mortgage, the word " Edward " is also written always without the loop.   So far as shown by his endorsements on his checks, the loop in any form first appears clearly on a check of March 11th, 1879 (one of July 23d, 1878, is doubtful), and from this date down to March 7th, 1888, sixty-four checks of Porter Brothers & Company, endorsed by Doolittle, are produced, every one of which shows the loop except possibly a check of June 25th, 1877.

Another series of checks, forty-two in number, given by Doolittle from January, 1887, to March, 1888, upon his own account, in the Tradesmen's Bank, is also produced, all of these having the loops except four.   On three of these four the commencement of the loop seems to have been scratched, October 27th, 1887, note January 12th, 1888, March 3d, 1888, but this is not certain, and no evidence was given on this point.   The remaining check, April 5th, 1887, commences the capital letter on the right hand of the curve and without loop, as was the custom before 1878.   In the deeds both of 1881 and 1887 the signature is written with the loop.   So far as the form of the signatures throw any light on the date of writing the notes in question, I think that, leaving out the note of January, 1873, it may be taken as the result of a comparison of the signatures in evidence (which is the only evidence relied on), that before 1878 Doolittle invariably wrote his signature without a loop on the capital letter " E " and commencing it on the right-hand side of the upper curve, and that after 1878 he wrote the same letter

with the loop, with scarcely an exception, commencing on the left-hand side of the curve.   Each of the notes in question is written with a decided flat loop and of the flat or extended form, usually, although not invariably, appearing after 1882, so that the question is, what weight is to be given to this circumstance in relation to either of the notes as evidence, and either alone or in connection with other circumstances, which are strenuously insisted on as destroying their character as evidence of loans made at the time they respectively bear date.

These further circumstances are that the notes themselves, as appears from the faces of them, were written at the same time, with the same ink, and are in all respects similar.   The calculations of interest made upon their backs have also, as is claimed, the same uniformity of appearance, which could only result from their being written at the same time, by the same person, and this is further confirmed by the fact which undoubtedly exists, that a similar mistake in the calculation of interest is made upon each note.   On each the calculation is one year short, a mistake claimed to be incredible except on the theory that the calculations were made not at an interval of seven years, but at the same time.

The genuineness of the note of 1878 as evidence is further attacked upon the ground that this note has been clearly mutilated at some time, in that an endorsement of some kind, which has evidently been upon the back of this note, has been erased by scratching, and further, that this erasure has been made skillfully and carefully with the object of concealing the fact that there had been any erasure.   The erasure is not in fact apparent except on careful inspection, but on such inspection and a careful examination there is no question but that an erasure has been made of some endorsement upon this note, and further, that the erasure has been in fact made in such manner as to conceal the fact of erasure except upon critical inspection.   In reference to this erasure, Mrs. Doolittle swears that she never made it, that the note was never out of her hand, and that if there is any erasure she cannot account for it.

Mr. Doolittle's testimony is not so positive.   He says that he

always kept an eraser on his desk at the store, and wouldn't swear whether he ever used it on the back of this note or not, and he repeats this answer after looking again at the note. He then says that he doesn't deny that he did make an erasure of something from the back of the note; that he might have started to figure interest on the note, or something of that kind, and then rubbed it out, and that he might have started to make entries on the note. Then, being further questioned, he says that he doesn't recall that he did make the erasure; that he does not admit that he did, or that he ever wrote anything on the note; that he didn't have it in his hand from the time he made it until he figured the interest on it; and his final statement is that he can't account for the erasure being put there, and that it was probably an old note that he found in his desk that had been figured on. This statement was made in March, 1895, the witness having been previously examined in June, 1894. Being re-examined by his own counsel on the testimony given in March, 1895, he says that the notes had been out of his possession since June, 1894, and had been in the custody of the complainant's counsel, to whom they were delivered. He then says that he was not examined in 1894, in reference to the erasures on the note of 1878, and that those erasures did not then exist on that paper in June, 1894, to his recollection.

In view of the admitted fact that Doolittle, before the production of the note in June, 1894, made on it the calculation of the interest, and that these are written after an erasure, the answer of the witness, if it was intended to refer to the time when this erasure on the back of the note was made, as having been made after June, 1894, is altogether reckless, unless, perhaps, he can be understood as intending to say that at the examination in June, 1894, he had no recollection of the erasure on the back. The circumstances above detailed, bearing upon the value of the notes as evidence, together with others which seem to be of less importance, do undoubtedly, in my judgment, cast suspicion upon the note of 1878 as evidence corroborating the existence of a debt of $5,000, with interest from 1878, at the time of the conveyance in November, 1887, but they are not sufficient to

Minzesheimer v. Doolittle.

justify me in finding that the note of 1878 was not given for a loan then made, as both Mrs. Doolittle and her husband swear. Such conclusion could only be reached upon evidence sufficient to satisfy the court that the note of 1878 has been actually fabricated since, and with the knowledge of both parties, and that the whole account of the original loan given by both witnesses is a deliberate fabrication and perjury.   While Doolittle's credibility has been greatly shaken, there is nothing in the evidence or in her account of the making of the loan in 1878 which would justify me in discarding Mrs. Doolittle's statement in reference to the circumstances of that loan, and upon this branch of the case my conclusion upon the whole evidence is that Mrs. Doolittle has satisfactorily shown that she did, on January 1st, 1878, loan her husband $5,000 upon the note in question.   The next branch of inquiry arising on the facts of the case is one of more difficulty.   This question is whether this debt was still in existence in November, 1887, and whether the deeds in question were given for the purpose of satisfying the debt due on the note for principal and interest.   Both Mr. and Mrs. Doolittle, who are the sole witnesses speaking directly upon the question, say that no interest was ever paid on the note, and that the sole object of the deeds was to pay this indebtedness for principal and interest. These direct statements are overcome and destroyed, as complainants claim, by certain undoubted facts appearing in the case, and mainly or largely by the examination of these two witnesses.

The main facts which appear to bear upon the question of the *status* of this debt as between the parties after 1878, are as follows: The amount of Mrs. Doolittle's fortune still remaining after making the second loan of $5,000 is left in some doubt by the testimony of the two witnesses.   From Mrs. Doolittle's own testimony it would appear that the interest received by her on the bonds before they were given to her husband, was spent by her as she received it.   This was the answer given by her in reply to the direct question as to what she did with the interest, and after she had at first declined to answer.   Her entire evidence on this subject is as follows:

Minzesheimer *v.* Doolittle.

"*Q.* What did you do with the money after you got it?

"*A.* I suppose I spent it as most women do.

"*Q.* Spent it as you went along, did you?

"*A.* I don't know as it is anybody's business what I did with it.

" By the Court—No, you will have to answer the question.

"*A.* Could I tell you what I did with the money?·

"*Q.* You spent it as you went along, did you?

"*A.* For anything that I know, I did.

"*Q.* That is the best of your recollection at the present, is it?

"*A.* That is the best of my recollection."

It is not possible, I think, upon her evidence thus given, to conclude that any large or considerable portion of the interest was saved or reinvested, for it does not seem possible that she could have forgotten the fact that she did save or reinvest it to any considerable amount. The cost of furnishing the house originally was about $3,000, as she says, and she paid part of this by agreement with her husband, less than half of it, and this amount, or a portion of it, may have been supplied by the interest coming due before 1873, leaving the principal of $11,000 to $11,500 still untouched at the time of that loan. After January 1st, 1873, and up to 1878, she received no interest on the $5,000 loaned to her husband in 1873, but she had received the premium on the bonds, the amount of which does not appear. Her own statement, as to her fortune left after making the loan of $5,000, in 1878, is that she had, perhaps, more than $3,000 remaining, and she doesn't know but it was another thousand, perhaps two thousand, but that she can't tell whether it was three, four or five thousand dollars. As to the receipts or possession of money by Mrs. Doolittle from any other source, after 1878 and up to the time of the deed of 1887, the evidence of both Mr. and Mrs. Doolittle shows that there was no source of any considerable sums other than from Mr. Doolittle himself. Mrs. Doolittle's own testimony on this point is not sufficient to establish that she afterwards received any considerable sum from any source whatever, even from her husband, for, in reply to direct inquiries on this subject, she at first says that she had some money at interest; that she thought someone in Connecticut paid her interest, but she couldn't tell whom, and that her im-

pression is she did lend money to somebody in Connecticut, but can't tell exactly to whom. The only other source of receipts, after 1878, suggested by her evidence is that she had a little money given to her from time to time, and the only person who gave her money after 1873, as she says, was her mother, who gave her $25, $50 or $100—she couldn't tell how much.

Doolittle's account, however, if true, shows that, from his gifts, the wife might have had considerable sums of money. He says that after 1878, when she made him the last loan, she had $4,000 or $5,000, part of which was from money he gave her and gifts from her friends. His average annual income from the firm from 1879 to 1887 was over $15,000, and was such that he could have given her considerable sums of money. Except in the general way above stated, he does not, however, swear that he did give her money.

In December, 1881, the husband conveyed to his wife, also, through his brother, the present intermediary, the homestead property, for the nominal consideration of one dollar. The value of this property at that time does not appear, and the only evidence from which it can be inferred or conjectured is that the entire property cost about $15,000 in 1874, and was sold for $22,500 in March, 1888, being about $14,000 over the $8,000 mortgage, and also Doolittle's present statement that it was in 1881 worth about the amount of the 1873 note and interest.

Mrs. Doolittle's statement and the original statement of Mr. Doolittle in reference to this transaction of the homestead is that it was made in payment of the debt due on the 1873 note for principal and interest, which then amounted (according to their erroneous calculation) to $7,391.67. Mr. Doolittle afterwards qualifies this account somewhat by stating that he gave this homestead property to his wife out and out and as a pure gift, without any agreement that it should be a payment of any kind, but that his wife, on the delivery of the deed to her, presented him with the 1873 note as a gift, and that he then tore off his signature and returned it to her.

During 1881 and 1882 Doolittle was engaged to some extent

in speculation (as he says he always had been), and so far as can be judged from his accounts with the firm, paid out about $10,000 to brokers during those years on speculative transactions. His income from the firm, however, was growing considerably larger and was in excess of his expenditures from 1879 to 1884, with the single exception of the year 1882, and at the time of this transfer of the homestead his credit balance with the firm was about $30,000.

It is the evidence as to payments made by Mrs. Doolittle, after this transfer of the homestead, out of moneys in her hand, that gives rise to the most serious doubt in reference to the truth of the statements of Mr. and Mrs. Doolittle as to the true consideration of the deed now in question. And in my judgment the decision upon this branch of the cause depends mainly upon the inferences which should be drawn from this testimony as to the subsequent payments. The testimony of both Mr. and Mrs. Doolittle is that, after this transfer, sums amounting in all to over $9,000 were paid by Mrs. Doolittle to her husband, and all out of money in her hands. These payments are of two classes. First, payments amounting to about $4,250, not connected with the homestead, and which were $1,250 in December, 1883, for the cash payment on the purchase of a lot from one Bailey, which was conveyed to Mrs. Doolittle; $1,200 for the expenses (beyond insurance money) of rebuilding the barn on the homestead property, which was burned in 1882; $1,500 loaned by Mrs. Doolittle to her husband in August, 1887; $2,000 loaned by Mrs. Doolittle to her husband in 1882 (of which he paid back $1,700 in the same year); $1,500 loaned him in August, 1887, and never repaid. The second class of payments out of her money, as is said, were the taxes, insurance and repairs, and interest on the mortgages ($8,000 on the homestead and $3,000 on the Bailey property), this class of payments for annual charges on the property, amounting altogether, between 1881 and 1887, to about $5,000, thus making the entire payment, during this time by Mrs. Doolittle out of her money, as is claimed, over $9,000. It is proved that the taxes, interest, &c., were paid in the first instance by the checks of

Porter Brothers, which were charged to Doolittle's account, but Mr. and Mrs. Doolittle now say that, immediately upon these payments being made, she reimbursed him out of her own money and by payments in cash. As to the other payments, she at first says that she can't tell for certain whether she paid the $1,200 for the new barn, or her husband, but afterwards says that it was paid out of her own money, and that the $1,200 for the Bailey lot purchase was also made from her money. And in corroboration of the loans to her husband of $2,000 in 1882 and $1,500 in 1887 from her own money, she produces her diaries for those years, which contain her memoranda of these loans.

The purchase-money for the Bailey lot—$1,250—was also paid for in the first instance by the check of the firm, charged to Doolittle's account, but Doolittle swears that she paid the money to him immediately in currency. He says also that his wife paid him $1,400 in currency for rebuilding the stable, and he corroborates his wife's statement that she loaned him $2,000 in 1882 and $1,500 in 1887, except that he makes them loans of money instead of bonds. These witnesses, by their evidence in reference to these payments by the wife after 1881, intend to leave no doubt that sums aggregating over $9,000, and including the annual charges on the homestead property, were paid to the husband by the wife, without any deduction, allowance or reference to the amount now claimed to have been due from the husband to the wife for interest or principal on the $5,000 note given in 1878. If these payments were not, in fact, so made, then, in view of the positive evidence of both defendants as to the fact of payments, their evidence as to the entire transactions relating to the debt after the conveyance of the homestead in 1881, or even as to its existence at any time, is discredited, and no decree could, in my judgment, safely be founded on their statement contradicting the consideration named in the deed of 1887. Especially is this true as to the repayment of the items of taxes, insurance and interest on the mortgages paid by the husband without any deduction for the interest or principal due on his note, for the sole apparent object of the invention of such

Minzesheimer v. Doolittle.

payments would seem to be to increase the apparent debt on the note by interest from its date.

On the other hand, if payments to the extent so positively sworn to were actually made by the wife to the husband out of the moneys in her hand, I think that, upon the entire circumstances of the case, the only conclusion as to the source of the principal part of this money must be that it originally came during these years from the husband himself. He had the resources from his income as above stated, and that he had the will or inclination is apparent from the fact that after the conveyance of the homestead (which, as he says, was entirely voluntary), and before November, 1887, his wife became the owner of the furniture, horses, wagons, and all his personal property at Montclair. "The horses that I sold," he says, "went to her credit, and she paid for the horses and sold them from $500 to $5,000 apiece." Just how or when his wife became the owner of all his personal property does not appear.

In view of the conveyance of the homestead and of the gift of all his personal property there by the husband to the wife, the repayment by the wife to the husband of the amounts paid by him for the charges on the property, without any deduction or allowance on account of the interest or principal of the $5,000 note, would seem to be reasonably explained, if she had also received from him money sufficient to make these repayments, for, under these circumstances, the existence of the $5,000 as a continuing debt to be acknowledged by the husband, or insisted on by the wife, would probably not have occurred. The yearly payments by the husband for charges on the property were over $900, and more than $600 in excess of the annual interest on the $5,000 note, and enough to have paid, from 1881 to 1887, the principal of the note, if any *status* of debtor and creditor on the note was considered to exist. Taking the view that their statement as to the repayment of these charges on the homestead are true, then the entire case would seem to show that, as between the husband and wife, the note of $5,000, given in 1878, was not considered or treated by them after 1881, or up till November, 1887, as an outstanding indebtedness of the husband,

either as to the principal or interest, and was not then a valid
or subsisting indebtedness which could be revived against his
creditors as a consideration for the conveyance of his property.
It is in view of the question of the continuance of the note as an-
acknowledged indebtedness after 1881, and after the gifts of the
personal property and the gifts of money (if these latter were
made), that the erasures on the back of the note are important,.
for the credits of payments would naturally appear on the back
of the note, and the fact that some erasure has been carefully
made and apparently with the object of concealing the fact of
erasure, is a circumstance against the defendants on this branch
of the case.

Taking any view of this evidence as to the repayments and
either upon the conclusion that it is false or that it is true, the
defendants have failed, in my judgment, to give such a satisfac-
tory explanation of the *status* of this alleged debt at the time
of the conveyance as, under the whole circumstances of the case,.
they were obliged to make, if the conveyance is to stand merely
as the payment of a debt and the preference of a creditor, and
my conclusion on this branch of the case is that the deeds in
question cannot be held to have been made for the purpose of
paying an outstanding debt, but were made, as they appear on
their face to have been made, voluntarily and without considera-
tion, and as a gift by the husband to his wife.

The remaining question, therefore, is as to their validity, if
regarded as purely voluntary conveyances.

The debt of the complainants upon which the judgment was
obtained, having been contracted subsequently to the conveyance
in question, this conveyance, even if voluntary, cannot be avoided
simply on that account by the subsequent creditor.   The rule in
such cases, as finally settled by the court of errors and appeals,.
in *Hagerman* v. *Buchanan*, *18 Stew. Eq. 292, 299 (1889)*, is
" that an actual intent to defraud, arising from all the circum-
stances surrounding the transaction, must be proved before a
voluntary conveyance will be decreed void at the suit of a sub-
sequent creditor."

The only question in this case arising in reference to the

application of this rule as to proving actual intent to defraud is whether such actual intent to defraud is sufficiently shown by proof that the voluntary deed or settlement was made in contemplation of the debtor's engaging in trade or hazardous speculations and with the view of placing the whole or the bulk of his property beyond the reach of those who might become creditors in the contemplated trade or speculations. That a voluntary settlement under such circumstances is fraudulent against such subsequent creditors and may be set aside, and that such proof established fraud on the subsequent creditors, seems to have been the rule in this state previous to the decision of *Hagerman* v. *Buchanan*. It was so declared by Chancellor Green in *Beeckman* v. *Montgomery, 1 McCart. 106 (1861)*, and a deed was there set aside upon the express ground that it was made in contemplation of future indebtedness, and was therefore fraudulent against subsequent creditors. This fraud, however, was characterized by Chancellor Green as a "constructive fraud" and was expressly distinguished from the existence of actual fraud; and in his statement of the result of his examination of the cases upon the rights of subsequent creditors, he seems to conclude that the particular fraud now in question is a constructive fraud and is to be distinguished from actual fraud.

The grounds for treating conveyances made with a view to future indebtedness as "constructively" rather than "actually" fraudulent against subsequent creditors is not stated, nor does the ground for such distinction seem clear unless by constructive fraud is meant a fraud which is legally inferred from these facts alone. And the question is whether, under the rule laid down in *Hagerman* v. *Buchanan,* such conveyance, in view of a future indebtedness, was a "constructive" as distinguished from an actual fraud and no longer subject to attack by subsequent creditors (overruling *Beeckman* v. *Montgomery* on this point), or whether the court, in that decision, ignored this particular distinction between constructive and actual fraud on subsequent creditors and included this particular class of conveyances, made with a view to future indebtedness, as cases showing evidence of actual fraud. Upon the whole opinion I think the latter view

is a correct one, for Mr. Justice Reed, in the opinion of the court, so far from overruling *Beeckman* v. *Montgomery* on any point, expressly cites it without qualification (at *p. 297*), and on the point now involved he says (at *p. 302*) " that the fact that a person has entered into a hazardous business or engaged in a speculative enterprise at or soon after the execution of a voluntary conveyance is strong evidence of a fraudulent intent. It evinces a desire to reap the benefit for himself if successful and escape responsibility if unlucky. Nevertheless, each case must stand upon its own footing, and no legal rule can be adopted as to the quantity of proof or the particular complexity of facts which will annul a conveyance upon this ground." And he then examined the evidence to determine whether this particular intent existed, concluding after examination that it did not. This shows, in my judgment, that the effect of the decision in *Hagerman* v. *Buchanan*, upon cases of this character, is to abolish the distinction between a constructive and actual fraud and to consider conveyances made with a view to future indebtedness, subject to attack by subsequent creditors, as actually fraudulent in intent, of which actual fraudulent intent the conveyance itself, under these circumstances, is strong evidence, but is not conclusive evidence from which fraud must in law be presumed.

This view as to the right of the subsequent creditor to set aside conveyances, made with this view to subsequent trade and speculations, agrees with the general rule of other courts. *MacKay* v. *Douglas, 14 Eq. R. 106 (Malins, Vice-Chancellor, 1872)*, is the leading English case, and was approved by Jessel, master of the rolls, in *Ex parte Russel, 19 Ch. Div. 588*, in this language : " The principle of *MacKay* v. *Douglass* and that line of cases is this, that 'A man is not entitled to go into a hazardous business, and, immediately before doing so, settle all his property voluntarily, the object being this : if I succeed in business, I make a fortune for myself; if I fail and leave my creditors unpaid, they will bear the loss.' That is the very thing that the Statute of Elizabeth was meant to protect. The object of the settlor was to put his property out of reach of future

creditors.   He contemplated engaging in this new trade, and·he wanted to preserve his property from his future creditors.   That cannot·be done by voluntary settlement.   That is, to my mind, a clear and satisfactory principle." In this country the same protection against conveyances, made with a view of entering into some new or hazardous business, is given to subsequent creditors whose debts arose in the contemplated business.   The rule applicable in these cases is stated in *Schreyer* v. *Scott, 134 U. S. 405, 410,* and cases cited ; *Neuberger* v. *Keim, 134 N. Y. 35, 38,* and cases cited.   In *Carpenter* v. *Roe, 10 N. Y. 227,* the *status* of voluntary deeds made pending speculations is specially considered.   *2 Big. Fraud 199–201; Wait Fraud. Conv. (3d ed.)* § *100.*

The rule laid down in *Hagerman* v. *Buchanan,* and to be applied in this case, is that actual intent to defraud upon all the circumstances of the case must be proved by a subsequent creditor, and that a voluntary conveyance with a view of engaging in or continuing hazardous enterprises, and with the view of escaping responsibilities for losses which may be reasonably contemplated in such enterprises, while it is no longer held to be evidence from which the legal inference of actual fraud must be conclusively drawn, is evidence of such actual fraudulent intent, and may, either along or in connection with the other circumstances of the case, and according to the circumstances of each case, be sufficient to make out the actual intent to defraud.   The main facts proved in the cause bearing upon the question of the intent in making out the deed, are as follows :

Doolittle had for many years been accustomed to speculate, sometimes heavily, in the cotton and other markets, and in the last articles of partnership between the members of his firm, running from 1885 to 1887, an express stipulation·was made that neither of the partners should directly or indirectly buy or sell on speculation during the term, and such act should be deemed sufficient cause for the others to elect to dissolve.   At the time of making this agreement Doolittle's only source of income was from the firm, and his only property was· his interest in the firm, the lot now in question and perhaps the personal property

at the homestead.   The business of the firm was then prosperous.   Doolittle's income therefrom had for six years averaged over $15,000 a year, and his credit balance in January, 1885, was about $25,000.

Notwithstanding this express stipulation against speculation and the risk involved in continuing it, he commenced speculations again in 1886, and in January, 1887, for the purpose of continuing them, while concealing the transactions, opened a bank account of his own in the Tradesmen's Bank (being the first bank account he had kept), through which account a large portion of the speculative transactions were afterwards made, over $11,000, from January to November, 1887, being made by Porter & Brothers' checks, and the entire deposits amounting to over $30,000.   His speculations during 1887 were continued on a large scale, and on June 15th, 1887, a heavy speculation in wheat on margins was closed out at a loss to him of $15,000. His speculations after this date were in cotton, and extending at times to as high as ten thousand or fifteen thousand bales, representing values then varying from about $500,000 to $750,000, and where the fluctuations of a cent per pound would make a difference of $50,000 on ten thousand bales.   Doolittle kept a memorandum or account of all his speculations during this year and this is produced.   He knew, he says, each day how he stood. During 1887 and up to the date of the deed, November 15th, 1887, he had paid out to his brokers over $24,000, receiving from them about $7,500, and having thus about $16,500 loss or held for margins on current speculations.

On November 15th, 1887, he was thus carrying over ten thousand bales of cotton.   On the 7th of November he decided to retire from the firm in the following December, and this information was communicated to his wife, who also knew, as both of them say, that he was speculating, and knew, at least in a general way, of his losses.   The purchases of cotton thus outstanding being on margins, Doolittle was, at the date of the deed, obliged to continue to carry them until they were closed out, and whatever margins were then in the brokers' hands (if there were any) were of course hypothecated until closed out,

Minzesheimer v. Doolittle.

and were not available assets for creditors.   The only property Doolittle had in November, 1887, clearly available to creditors, seems to have been the Mountain avenue lot.   The interest in the partnership, although standing on the books at $25,000 in January, 1887, was not of that value for the purpose of liquidation, nor could it, or any amount near this, have been drawn for it from the firm.   Doolittle had, by a special agreement with the firm, guaranteed a large account of one of the consignors for whom the firm had made advances, then exceeding over $70,000, and in November, 1887, this account was in danger.   He had drawn, up to November 15th, $20,696.25 from the firm, leaving less than $4,000 of the credit balance of $24,600 at the commencement of the year, and over $16,000 (from this or some other source) was paid to brokers beyond his receipts from them.   The profits for the year 1887, as afterwards ascertained (including his allowance of $2,500 for expenses), was $17,217. The entire value of his interest in the firm, therefore, at the time of the deed, could not fairly have exceeded fifteen or eighteen thousand dollars, subject to the guaranty of the Harvey account.   The partners subsequently released him from his guaranty in the Harvey account and purchased his entire interest in the firm for about $10,000 after the expiration of the term.

Doolittle's speculations were continued immediately after the execution of the deed upon the same extensive scale, with the final result that in the early part of March, 1888, his accounts were closed out at a loss of over $25,000.   Just previous to the closing out of the accounts, he transferred to the other partners his remaining interest in the firm (nominally about $19,000) for $10,000, about $5,000 of which was paid to the brokers, and the balance, which he received in cash, has been expended by him.

Doolittle says that this sale of his interest was for the purpose of protecting the firm against his creditors, and that his interest was to continue, and, if this be true, it perhaps throws some light on his intentions to leave his interest in the firm available to creditors at the time of making the deed in question.

The voluntary settlement of this real estate upon the wife practically exhausted the settlor's property directly available for the subsequent debts contemplated, and in his circumstances was not a settlement reasonably made by a solvent debtor. If the conveyance was not, as I have concluded, made to pay an existing debt, no reasonable explanation has been given of the making of this deed at this particular time, and this is a circumstance also pointing to the actual intent of the deed as intended to withdraw the property from future creditors. And if my conclusion is correct that this debt had been treated by both the husband and wife before 1887 as satisfied and no longer existing, then the renewal for the purpose of affording consideration for the deed would be very strong evidence, as to the existence in the minds of both parties to the deed, of an actual intent to defraud the grantor's subsequent creditors. If, as complainants claim, the debt now claimed never existed, the invention of it for the purpose of giving a fictitious consideration to the deeds, of course, points conclusively to the existence of fraudulent intent.

Upon the entire evidence of the case, I conclude that a case of actual intent to defraud subsequent creditors, in which both parties participated, has been satisfactorily made out, and I will advise a decree setting aside the deed as void against the complainants.